May it please the Court, my name is Bhanu Ramachandran and I represent the appellant in this case, Harrison Nunez. I would like to reserve two minutes of my time for rebuttal. All right. The uncontroverted record evidence in this case indicates that Affiant Salvador Buenrostro swore that Defendant Officer Duncan stated his intention to strip search Mr. Nunez the next time he came to work at his prison job. The evidence further indicates that the next time Mr. Nunez Help me with the procedural posture here. Was this dismissed on a 12b-6? No, it was actually dismissed on summary judgment. On summary judgment? Yes. So the evidence viewed in the light most favorable to Mr. Nunez, the government, was the movement below. Okay. Since we're talking about procedural issues, I had real trouble seeing how any of his claims, other than not getting the right number of the program statement, were carried through to the appeals stage. And so I was really having trouble figuring out how he had exhausted any of his administrative remedies on the claims that you now want to bring. So maybe you could just take me through the claim that, I guess the strip search claim, which is what you started out arguing, and explain how he had gotten through the administrative process. Okay. He started out by bringing an informal complaint the way that he was supposed to. Okay. Now, which date, which one is that? Is that? It's at page A2 to A3. Is this the May 14th? Yes. It's May 14th or 15th. It was a little unclear to me from the paper, but. Okay. And then he says, in response to the question, state what action you want staff to take to correct the situation. He says, I want staff to notify Nunez under which law or statutory rule Officer Duncan was acting under. Yes. So he, at that point, his request was limited to getting an identification of the law or statutory rule. And he isn't challenging the strip search as I read it. I guess I would say that this Court's recent decision in Griffin v. Arpaio that was just cited by the government in their 28-J letter on, you know, earlier this week, Monday or Tuesday, I guess, that case suggests that the way that you decide whether the grievance was adequate at the prison level was whether it alerted officials to the nature of the dispute. Doesn't it say you follow what the requirements are of the prison and what the form is? I mean, that's how I read it. And so here we have a question. What action do you want staff to take to correct the situation? He says, tell me the number of the program statement or of the law or statutory rule. Well, the BOP regulations are pretty general in explaining what the prisoners are supposed to say in their complaints. And it's my understanding that Mr. Nunez believed that he was complaining of the search by saying what authority was there for this, the way you might get angry and say to someone, hey, what gives you the right to do that? You know, that's not right. Well, on the second page, that is to say, at least as I understand what he's doing on the second page, he has two paragraphs, one preceded by a bracket that says paragraph 1 and the other preceded by a bracket that says paragraph 2. And I assume that they correspond to the numbered paragraphs in the form on the previous page. Number 1 says state below your specific complaint. Then he gives number 1. He's subjecting him to a raffle strip search. And then paragraph 2 is sort of an explanation of I want the staff to notify. He describes the search that he's clearly objecting to. Yes. So I think I'd have to be a pretty dense prison official to think that the only thing he wants out of this is just give me a copy of the rules. He was strip searched, and he thinks that he wasn't supposed to be. Yes. And then on appeal, when he files the BP-9, does he ‑‑ it didn't seem to me that he was carrying on with the strip search. He says, one more time, inmate Nunez wants the staff's proper notification under which law or statutory rule Officers Duncan and Skendroy were acting under while performing strip searches. So does he reference a claim about a Fourth Amendment claim in that one, in your view? You know, I don't know that he references the Fourth Amendment at many points in the process. But he does ‑‑ Well, wait. Not so fast. I'm on the BP-8. Yes. So you're still on ‑‑ It's called addendum. Yes. Paragraph 2. Yes. Interest in human dignity and privacy, which the Fourth Amendment protects. Yes. But I thought that Judge Ikuda was referring to the BP-9. Oh, I'm sorry. You said at any point. I'm on to May 22nd. I'm just still trying to figure this out. Because he seems to focus, then, in on what's the ruler law. And then he gets ‑‑ the warden grants the BP-9, says it's Program Statement 5500.09, which is wrong. And then we have this lengthy series of appeals where he's just given the runaround. I understand that. Yes. And then he finally gets the correct number from, or gets the information from the Department of Main Justice, I think he's finally at. Yes. In D.C. But throughout this process, other than this first mention on his BP-8, he never again raises a Fourth Amendment issue. He says the words strip search. And I think that, again, this Court's recent decision in Griffin v. Arpaio actually states that they don't need to use the right legal ‑‑ they don't need to state the legal claim or cite their legal authority. It's more about alerting prison officials to the nature of the dispute and providing some way to resolve it. And clearly he was complaining about being searched. And I think that even though it's not cited in the briefs, there's another point in the record where he had actually complained before the search because he got wind that it was going to happen. And he filed a BP-8 essentially asking why this was going to be the case. Well, it does put him in a bit of an awkward position, doesn't it? Because he comes forward in the BP-8 and says, I think, it appears to me, he's making a clear Fourth Amendment claim if you look at the addendum. And as Judge Fletcher said, he references the paragraphs. And he talks about under the Fourth Amendment and what the Fourth Amendment does. Yes. The prison comes back and says it was all a lawful search. They saw it as a Fourth Amendment claim. But then they provide the wrong program statement. Yes. And his efforts, as I understand it from that point forward, was simply an effort to understand the program statement. And one can infer, therefore, to know best how to challenge the Fourth Amendment, the claim he was bringing. Yes. And so it's your view that it was just a continuation of the Fourth Amendment claim throughout in his effort to obtain that information? Yes. I believe that's the case. And also, he does use the word constitutional at other points in his BP-9, even though he doesn't say Fourth Amendment. And it's the prison officials who direct him to make the FOIA request. So he does what he's told, essentially. He pursues the grievance the way he's instructed to pursue it. And he did actually pursue his grievance at every level of the BOP's administrative review process. He was untimely with the last two parts. But when his first, when his BP-10 gets returned as untimely, he actually states that it wasn't untimely because he was pursuing the FOIA remedy almost as though he had believed it was being told while he did that. If we determine, however, that there was simply a mistake by the prison officials, this was not intentional. Yes. If we were to make that determination or if a lower court were to make that determination, how would that impact our view on the law as to whether or not there should be an exception to the exhaustion requirement? Does it make a difference if the prison's conduct is intentional versus unintentional? Obviously, if the prison says, you know what, we're not going to process this. We're done processing all BP-8s, 9s, 10s, and 11s with you. It makes that intentional choice. Right. It's a pretty clear picture. Does it make a difference that this was conduct that appears to have just been a mistaken citation? Actually, I think there's evidence in the record that it wasn't – well, there's other intentional conduct to thwart his correctly pursuing the appeals process within the prison, but that aside, I think that there's – it's almost certainly true that there's a difference between whether prison officials act intentionally to thwart his pursuit of administrative remedies and they don't, but not only is there evidence here that they did act intentionally to thwart his pursuit, there's also, I think, authority that even if they were just making mistakes, even if they were simply incompetent, that at some level that also excuses mistakes in his exhaustion process, excuses procedural errors, or simply stops the government from complaining about untimeliness that they caused, more or less. Should we treat his request for – okay, on what authority is Officer Duncan relying when he does this? I mean, prison litigation is different from ordinary litigation. The complaint system is different. I mean, it's all set up under different systems, so the best I can do is sort of work by analogy, but this kind of looks like a discovery request, and it's not an available response as a defense to a failure to comply with a discovery request. Well, I gave you the wrong document, but I didn't do it on purpose when you had in your possession the right document. No, you're supposed to provide the right document. So, I'm trying to figure out whether intentional misleading or inadvertent misleading is relevant, and by analogy to discovery, this kind of says this looks like discovery, and to hold it against him in the sense of sticking him with a failure to comply with the procedural requirements based upon their improper response, whether deliberate or not. Based on the record here, I don't know whether it was deliberate or not. I mean, I could have my suspicions. Well, I think there's evidence that if not – if not deliberate – well, first of all, there's evidence of deliberate attempts to thwart him from pursuing administrative remedies in that he – in his verified complaint, he stated that Officer Johnson, you know, called him in the early morning hours within days of his filing his first official complaint regarding this search to tell him that his administrative complaint was being denied and that he was being fired from his desirable prison job. There's further evidence that Officer Smith attempted to intimidate him from filing further complaints. So, in some sense, you may not have to reach the question of whether you would require – whether you would allow it if it were just mistakes that caused his procedural errors. But I also think that here the mistakes rose to a level of some kind of indifference that could almost be deemed recklessness or another state of intent, where they actually told him to pursue the FOIA request. They didn't say, which they could easily have done, and it wouldn't have created any burden on prison administrators, any additional burden for them to say, take it to the next level, take it to the central office. Now, time's running, so I want to make sure I get to the next point. Assume that we get past the exhaustion. Yes. That's for the moment only an assumption, but we actually get to the Fourth Amendment claim. The district court did get to the Fourth Amendment claim and said there was nothing there, or rather said that it wasn't violated. Yes. You obviously disagree. What do you say in disagreement? I say in disagreement that the unconverted affidavit of Salvador Buenrostro indicated that Officer Duncan stated his intention to strip search Mr. Nunez the next time he came to work. The next time he came to work, Officer Duncan searched him. This, at minimum, raises a material question of fact whether Officer Duncan's so-called raffle procedure for selecting prisoners for search was, in fact, a ruse, and he had singled out Mr. Nunez ahead of time beforehand. I want to ask you about that, because under the Fourth Amendment, our case law and the Supreme Court's case law is that the subjective views of the officer or the prison guard don't really matter. It's whether there was a under Bell and under Turner, be sadly, whether there was an objectively reasonable legitimate theological goals. So I wasn't sure what any – even if we agreed there was some sort of subjective intent or material issue as to that, whether that would make any difference in the Fourth Amendment analysis or how that would make a difference. I believe it would make a difference, because even though it may not be about what was going on in Officer Duncan's head or why he didn't like Mr. Nunez or things like that, part of subjective intent, I think it has to do with a fair application of rules, whether, as this Court has cited in the Phillips v. Hust case, even a perfectly good rule or prison policy can be applied unconstitutionally when officials are arbitrary or, you know, act out of personal animosity. I also think that it's unwarranted under other case law of this Circuit and other Fourth Amendment Supreme Court cases that suggest that you have to constrain official discretion, that officials can't act with unbridled discretion or on the basis of whimsy. Michigan v. Sitz and Delaware v. Prowse are probably the key Supreme Court cases. The checkpoint cases. But in Delaware v. Prowse, there's not a checkpoint. And that's the reason why the Supreme Court invalidated the search, because not because the officers had something bad in their heads or they had it in for the motorist, but because they can't just choose somebody who they feel like choosing. They need to be ---- But you can do that for a traffic stop. Right. An officer can suspect someone's a drug dealer and see that they don't use a turn signal and pull them over. Yes. As a pretext. And the Supreme Court has said that's okay. Right? Yes. A pretextual stop is okay if there was another reasonable other basis for the official suspicion. As long as you have the lawful authority to conduct the stop. For instance, the traffic signal wasn't working. Yes. But this Court also ---- The question in the prison context for a search is legitimate penological ---- does it serve a legitimate penological purpose. Right. And your argument is that if you credit everything on Nunez's side, there was no reason for a search. Right. There was no legitimate penological purpose at issue here, although had it been done differently, we might come to the opposite conclusion. But according to him, the only purpose was to harass Mr. Nunez. Right. I think the question isn't whether there's a legitimate penological interest in searching a prisoner at some point. The question is whether there's a legitimate penological interest in allowing Officer Duncan to pick people for search based on his own whimsy that day or humiliating them by this purported raffle procedure when he really knew all along who he was going to search. Okay. Now, we have taken you over your time. Let's hear from the government, but we'll give you a chance to respond. Thank you. May it please the Court. Adrian Brown on behalf of the officer defendants from the United States Attorney's Office. Your Honors, the key issue in this case to start with is whether or not the district court was correct in determining that inmate Nunez did not exhaust his administrative remedies. And I'd like to follow up with Judge Acuda's concerns about that, because I would ask this Court to re-review the processes that are required under the statute, under the regulations, given Judge Fletcher's and Judge Seabright's concerns about the BP-8 that was filed. The BP-8 does not actually start the formal administrative remedy process, and that was cited in the government's addendum in our answering brief. In actuality, the BP-8 is an informal process that starts out the inmate to try to resolve the matters informally. Can an inmate skip the BP-8 and go straight to a BP-9? They are encouraged not to, but they can. I mean, they can. Essentially, the prisons try to encourage them to resolve the complaints informally, and that's in line with the PLRA's goals, which is to allow the prison to resolve the complaint first. You say that. There's something on the record that tells us that a prisoner can skip the BP-8. Well, at A3 of the statutory addendum, it talks about that the deadline for informal submission and submission of a formal written request on the appropriate form is BP-9, which is 20 calendar days following the date on which the basis for the request occurred. So because the regulation does not require a BP-8 to be filed, that is why it's not absolutely required. Okay. And I'm not sure it's worth pursuing at this point. Okay. Thank you. So I would like to address Judge Acuta's concerns that, indeed, when he filed the BP-9, he did not state a Fourth Amendment violation. And although he may have ---- Let me ask you this. When a BP-9 is filed, does the prison have access to any papers that were filed with the BP-8? You would presume so, yes, that it would be part of the inmate's file. Yes, Your Honor, that's correct. So when the prison gets the BP-9, which is the first formal complaint, we may assume that they have in hand the BP-8 and can expand or explain what's in the BP-9 by looking at the BP-8? That's correct, Your Honor. Okay. At the same time, what I would ask Your Honors to understand is that the prison thought that they had resolved the BP-8. When Mr. Angus, the correctional counselor, answered Mr. Nunez's BP-8, he actually gave the substance of why the officer conducted the search. And he told officer ---- excuse me, he told inmate Nunez, and I'm looking at A-2 of the appendix that inmate Nunez filed, that inmates who pass through the lobby are subject to pat searches and random visual strip searches. And that's what we have here is a visual strip search. I'm sorry. Let's see. Correctional counselor's comments. Okay. This is part of the BP-8. Yes, Your Honor. And this is ---- The officer about your complaint. Now, this is written by a prison official. Yes, Your Honor. Officer ---- Passed through the lobby, are subject to pat searches, random visual searches, and the post orders, work to post follow, chose to make it fair. Okay. Got it. So that's in the BP-8. That's in the BP-8. And so, in essence, my point is, is that the prison believed they had answered his BP-8 by telling him, and in essence, it was consistent with what Warren Hood told him in response to his BP-9, which was that the strip search was okay. There is a policy that allows that. And, indeed, Angus goes further to say that they were following post orders as well. So because the prison had every right to believe they had answered this BP-8, when inmate Nunez filed his BP-9 and specifically said, and I'm looking at A-4, he says one more time, Inmate Nunez wants this gap's proper notification under which law or statutory rule Officers Duncan and Jindro were acting under while performing strip searches under color of federal law. Lieutenant Jindro is well known among the general inmate population as being one who abuses the color of law. Now, at this point in time, what's very important about this is that inmate Nunez had all the facts in front of him as to what he believed happened to him wrongly. He knew the name of the officer, but he doesn't say it was Officer Duncan. He says he specifically points to Lieutenant Jindro as being the one who abuses the color of law. He knew when the search happened. He doesn't provide that in here. He knew how it happened. He knows both Duncan and Jindro. He does. He wants to know what the statutory rule is for those two. But my point was that he points to Lieutenant Jindro as being the one that violates the color of law. He doesn't provide any facts for the prison to believe that he's still pursuing that Fourth Amendment issue, which they answered in his BP-8. Well, you know, somebody reading this sequence can't really be under any great illusions. He doesn't like what happened to him. The prison has responded, but we get to do it because of the rule. And he still doesn't like what happened to him, and he's responding to the response that he got. He says, well, okay, where's the rule? But it's clear that he doesn't like what happened to him. It's clear that in his initial BP-8, he thinks it violates the Fourth Amendment. And it seems a perfectly sensible lay response when somebody said, well, it doesn't violate the Fourth Amendment because we got rules that say we can do it. And he says, okay, well, where's the rule? But that doesn't strike me as abandoning a Fourth Amendment complaint. He's trying to get at their justification. And even so, even if we took that premise as is, Your Honor, as you state, he still didn't follow up with the exhausting his administrative remedies on that, because once he received Warren's hood response, then he had, as was stated right on the form, that if he was dissatisfied with this response, your appeal must be received in the regional office within 20 calendar days. And that is on A-4. Now, what he chose to do was he didn't go further and exhaust his administrative remedies. Instead, he goes back, and I'm looking at A-6, and he goes back and he says that I received this response in my BP-9. However, I went to the program statement, went to the law library and could not find that program statement. Please provide him with a copy. And, of course, they've given him the wrong number, so he can't find it. He has given him the wrong number, but the ELRA requires him to he would have been required to file another appeal. And it is perfectly stated clearly on the A-4 that that was the instruction for him to do, and he did not choose to do that. But that begs the question. That's the question before us. Should there be an exception to the exhaustion requirement here? He didn't exhaust by following from going from a 9 to a 10 to a 11 in the way you would have liked him to, or we would have liked him to because we wouldn't be here today if that was the case. But they gave him the wrong citation. And part of the Bell test focuses on the justifications for initiating the search. And it seems to me he had a reason to want to know what is the foundation here I'm working under? What are the rules that apply here? And from there, then, pursue his Fourth Amendment claim. Yes, Your Honor. And what's interesting to answer Judge Fletcher's concern about the discovery issue is that Wardenhood does provide him with the correct substance of the policy statement. It would have been ---- Yeah, but if somebody gives me the substance of it, like they say, I'm entitled to do X, Y, and Z, and I'm relying on Rule A123. Any normal lawyer, and it turns out Mr. Noonan is, although Lay isn't a bad lawyer, he says, well, okay, that's what you say it says, but let me see it. Absolutely. And they say, oh, well, go look at Rule da-da-da-da-da, and they give him the wrong number. So he can't see it. He can't see it. And before he wants to go forward, he says, you know, I'm really uncomfortable ---- I'm now paraphrasing, but I'm really uncomfortable going forward until I've seen the rule that these people are relying on is the justification for their action. Yes, Your Honor. The prison never does give it to them. Somebody at Main Justice who finally says, you know, the truth is, here's the    da-da-da-da, and I'll look at Rule da-da-da-da. So the former exhaustion during the FOIA request was when he gets it. They determine that. But, Your Honor, it doesn't excuse his requirement under the PLRA. We are here because the PLRA requires him to exhaust his administrative remedies. And he chose not to continue that appeal. Well, but we now know there's enough case law out there that says formal exhaustion is excused where the obstacles are sufficiently high. Paraphrase of the law, but we roughly have that in the law. Right. He doesn't have to plead formal exhaustion. However, as this Court just recently stated in Griffin, he does have to provide the officers with enough facts in order for them to appropriately respond. And in here, they did feel the – Well, I think they – he gave them quite a lot of facts. The person who didn't give the right facts was the person who gave them the wrong number. Well, he gave them the facts in the BP-8. He did not give them the facts in the BP-9, which started that formal process. But you just said to me that we may assume that the reader of the BP-9 has in hand the BP-8. Yes. That would be part of the file. However, the prison believed that they had answered that BP-8. And that's where I get back to Griffin, because in Griffin, what's required is for them to provide enough facts for them to answer the response. Well, he did provide enough facts for Gary Angus, Officer Angus, to answer the response. But then I'm sort of taken by on A-4, where he says the BP-8's response is out of the subject matter of Inmate Nunez's request, which seemed to me that he was rejecting the information that they gave him, that this is the reason we do the search, and said, that's not what I'm asking. And then he says, one more time, what I'm asking for is the number of the rule. So it did seem like his attention was to try to trace down the rule, and he was rejecting their explanation as to why the strip search was reasonable. That's correct, Your Honor. And that's my point in the sense that the prison believed they had answered that BP-8. Mr. Nunez did not believe they had answered it because he wanted that rule. He never claimed that Officer Duncan searched him inappropriately. He never believed that his First Amendment rights were violated. Wait a minute. Did you just say Nunez never believed they searched him inappropriately? In the administrative, in the BP-9. Starting with the BP-9, he does not provide all the facts that he knew of what had happened to him. If he believed he was picked out unfairly, he could have provided that in the BP-9, and he did not. He did not complain about where the search occurred, and he did not complain about how the search occurred. And you're, for purpose of the answer, you're just giving me, you're assuming that the BP-8 is there in front of them as well and referenced in the BP-9? I have no reason to believe that it's not in the prison file, in the inmate file. All of these would be filed in the inmate file, and, in fact, Margaret Ogden talks about how it's, how they're tracked in this entry. But let me make sure I understand your position on this. Are you saying that in responding to a BP-9, the prison is not required to acknowledge or in any way rely on what's in the BP-8? Or are you saying because they have it in the file, they are presumed to know that and that that is the foundation of the BP-9? What are you saying? I believe that they would have had that information before them. I do not believe they are required to consider that as a foundation for the BP-9 because Okay. I'll make sure then. You're saying that when they have the BP-9 in front of them, even though they also have the BP-8 in front of them, that's the foundation for the BP-9, they are allowed to look at the BP-9 and pretend that they don't know what's in the BP-8? No, Your Honor. Not pretend, but they are allowed to see that it was answered. But act as if they don't know what's in the BP-8? No. And I don't believe they didn't act that way. They simply wanted to answer his response because Mr. Angus had answered why he was concerned about the search. He said that he talked to the officer about the complaint. He said that inmates passed through the lobby. And, again, this is to control movement of contraband in this visitor center lobby. And so Correctional Officer Angus does go back and answer the BP-8's concerns. So what I'm saying, Your Honor, is if the prison official that's answering the BP-9 looks at the BP-8 and sees, okay, Mr. Angus answered this about where the strip searches occurred and how it occurred, then upon the new BP-9 being filed, is there a gain for the officer to say? What you're really saying, though, is that Mr. Nunez started off with a Fourth Amendment complaint, got a response, and was okay with the response, but just wanted to see the program statement. And that's what the prison saw out of all of this. Yes, Your Honor. Yes, Your Honor. That seems to me a kind of hard pill to swallow because I don't know. He's just an interested person who just wants to read the program statement. I mean, that's all that's left. And you're saying that even with that BP-8 there, all the prison officials were seen through this, even though he's pro se and you should liberally construe, you know, his words here. He forfeited or gave up everything about the Fourth Amendment and was only interested at that point in time to see the program statement, but he had no concerns beyond that. He never raises it again. And, in fact, the facts show on the record that he was interested in the law. He was, in essence, acting on behalf of all these other people in his work detail to find out what rule was allowing the officers to do this. But what I would like to turn to is, because I know I'm running out of time here, is that if, indeed, this Court determines that Judge Aiken did not properly find that the administrative remedies were not exhausted, then this Court needs to remand it back for the termination of qualified immunity. The Court did not make that determination during her findings. Let me hold you up for just a second. We're now assuming, and I'm not citing, we're now assuming we've gotten past the exhaustion and we're now to the question of Fourth Amendment, but you've moved directly to qualified immunity. I suspect that doesn't mean that you're conceding that there was a Fourth Amendment violation. No, Your Honor. I just wanted to make sure that the Fourth Amendment violation before we get to the question of qualified immunity. I'd be happy to address the constitutional amendments, and I'm happy to know that that's where the concern lies. The issue here is, and again, to follow up with what Judge Akuta and the plaintiff talked about, is whether or not this was within the constitutional limits. This, in order for it to be within the constitutional limits, it had to have been a reasonable belief that there was contraband or there was a reasonable opportunity for contraband to have been hidden on inmate Nunez. Now, Judge Aiken makes a finding of fact, in her opinion, that there was reasonable belief because, as she cites correctly, the 28 CFR 552.11, inmates returning from an outside detail certainly meets that criteria. Thus, any or all of the returning inmates could have been searched under the circumstances of this case. Outside detail includes from one prison facility to another prison facility? Yes, Your Honor. And in fact, the way that Sheridan is set up is there are three facilities at Sheridan. There is a minimum security camp, which is where inmate Nunez was being held. There is a Federal Detention Center, which is a separate facility, separate entrance. And then there is the medium security prison, the Federal Correctional Institute. And that is where inmate Nunez was leaving from. So he was on this work detail. He was cleaning the lobby area and the visitor's center, which is a prime place, and that's why there's a concern for contraband to be left in that area. Contraband can be anything from cell phones to drugs to anything else inmates, cigarettes, anything else inmates are not supposed to have. And that's the valid penological interest here to prevent the movement. What evidence do we have from the government that these searches have been taking place before? Well, what we have, the evidence, the only evidence we have, Your Honor, as far as them taking place before is that under the program statement, they are to be conducted on a periodic basis. So that's not evidence that they actually have been conducted. And the reason I'm asking that question is I'm looking at the program statement, now the right one. There's in bold, it quotes the CFR stuff. And then there's a comment that's, I guess, internal to the prison. It says, inmates must undergo visual search when leaving the institution. That's not at issue. But then it says, examples of other situations requiring visual searches include conducting periodic visual searches of inmates returning from outside work details. So one of the questions is, what is an outside work detail? Does it mean from outside the prison? Or could it mean from one part of the prison facility to another? Because he's housed in the minimum security. He works in the medium security. But if this regulation means that outside work detail includes what he's doing, that means that they should have been doing these searches all along because the regulation says required. Yes, Your Honor. And I see no evidence in the record that they have been doing this routinely. Your Honor. Which leads me to think, well, maybe this isn't an outside work detail within the meaning of the regulation. So what am I supposed to do with this? If I notice I'm over time, so if I may answer your question. You get to talk as long as we get to ask. Yes, Your Honor. So don't worry about your time. Okay. Your Honor, to answer your question, this was an outside work detail. And the reason being so is because the way Sheridan is set up and that it's three separate distinct facilities. No, no. I understand how it's set up. But my question is, well, if it is an outside work detail, that means that these periodic searches should have been going on all along. And according to the evidence I've got in the record, there's simply no evidence that they have been going on all along. Your Honor, there's no evidence that way. And there's no evidence that they weren't going along all the time as well. But if I can also turn you to the program statement, that part is in discretion of the guards. Because I believe they use the word. The word says requires. Or maybe it doesn't mean requires. Maybe it really just comes under the may part of the regulation itself, may do it. Yes, and that's where I was getting to. I'm looking at A24. It's also in SCR 49. Staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the person or a good opportunity for concealment has occurred. Right. So if we're in the may, I've got absolutely no quarrel with you. But then the question is, they have discretion. But then the question is the manner in which the discretion was exercised. Exactly. And Mr. Nunez's case is, he says, listen, this is not he doesn't contest that, a random search that's truly random, that doesn't target him because he's gay, doesn't target him because Dr. Duncan has it in for him. He says if it's a truly random search, I'll leave that one alone. But he's saying this wasn't a random search. This was targeting me because, and then he has a few reasons. Well, to your first point, it doesn't have to be random. There just has to be a reasonable belief that there is an opportunity for contraband. To your second point in regards to targeting office, excuse me, inmate Nunez, indeed, Officer Duncan, if Officer Duncan believed that inmate Nunez was trying to get around being searched by either claiming he was homosexual or because he was claiming that he knew the law better than inmate, than Officer Duncan did, then Officer Duncan has a reasonable belief to believe that inmate Nunez may very well be concealing  That's a good question, isn't it? I mean, that's for the jury. What you just stated would clearly be a question for a jury. Well, it was not, what my point is, is that Judge Aiken did make a finding of fact that there was a reasonable belief. And that was, that was not, that was not contested. She can't make a finding of fact. This is summary judgment. Let me ask you this. She can't make a finding of disputed fact. Right. Let me ask you this. Assume, and I'm not asking you to concede factually, assume that the only reason Nunez was searched was that Duncan had it in for him. And we can have several possible reasons. I will hypothesize one of the reasons that Nunez advances, he has it in for him because he's gay and he files stuff. Assume that that's what happened and that's the reason for it. Does that violate the Fourth Amendment? I don't believe that's an appropriate reason to search somebody because he is gay. The answer is, the question is, does that violate the Fourth Amendment? And my answer, the answer is yes or no or I don't know. I believe that it would violate the Fourth Amendment. But I don't believe that's what happened here. I believe what happened here. That's what Nunez says happened. I understand that. But Officer Angus interviewed the, interviewed Officer Duncan as well and says, I interviewed Officer Duncan and he said that he was following post orders and he chose to make it fair by allowing inmates to choose a number. And remember, there were only four inmates and it was a 25 percent. I think you now are arguing facts to the jury. That's their story. Nunez has a different one. Well, however, that is. And if this Court believes there is a disputed fact, then again, the remedy is to remand. However, we do not believe there is because of Judge Aiken's determination that it was undisputed that inmates returning from an outside work detail meets this criteria of there being a reasonable belief of contraband. And inmate Nunez would have the burden of proof to determine that, in fact, it was for some other reason. And he did not present enough evidence on the record to show that there was a retaliatory reason. Why does the subjective views of the officer matter in this case? I mean, isn't it just an objective question whether it's objectively reasonable to search individuals that come back from an outside, as defined by the prison, work effort? That's correct. I'm not understanding your comment that it would violate the Fourth Amendment if he had some subjective view as to why he was doing it. Well, I'm just saying if there were somehow facts below that, indeed, Officer Duncan, that was the sole reason why he picked them out, then that could be a cause of concern for the Fourth Amendment. I don't believe that's at issue here. I don't believe the subjective reasoning is at issue here, because there was a reasonable belief for contraband to have been concealed. There was a legitimate penological interest to search Nunez because of that. And Nunez did not present enough evidence to show that there was some other retaliatory motive. And Judge Aiken and Nunez conceded that not only was the place of search was okay, but also the inmates were informed of the searches. And that was in Van Roostro's affidavit that he provided at age 76. Inmate Van Roostro tells us that Officer Duncan told us he would not take it personal if we quit, but during the following days we were going to get strip searched unless he was told to stop by his superiors.  So I think there is a reasonable belief that contraband was concealed. I think there is a reasonable belief that it was concealed, and Judge Aiken's finding the fact that there was a reasonable belief to believe that contraband could have been concealed based on all the evidence that was presented to her is appropriate and therefore summary judgment should be affirmed in this case. Roberts.  Thank you. Thank you, Your Honor. Why don't we start out with two minutes on the clock for response and we'll see where we go. Thank you. I'd just like to raise a couple of points in response to the government. And please keep your voice up. Sorry. A couple of points in response to the government. The first point is in response to the issue of whether the BP-9 or the BP-8 state every fact, such as the date of the search, you know, or link the, you know, explicitly state Officer Duncan's the one who performed the search or things like that. In the Griffin v. Arpaio case that this Court decided, the Court makes it very clear. It says, A grievance need not contain every fact necessary to prove each element of an eventual legal claim. The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. So I think that the criticism that these initial grievances by Mr. Nunez were inadequate to alert the prison to the nature of the claim just because they didn't repeat the date of the search or state that it was Officer Duncan who, you know, bore the primary responsibility isn't quite right, because it's clear that he was complaining about a search. The next thing that I wanted to bring out is that — I'm saying that Griffin failed to exhaust because he didn't provide notice of some element of his lower bunk claim, of his bunk claim. And so he really did — he really did require more detail than — and he already had a lot more detail than Mr. Nunez did in his DP-9. So how do I — how do I differentiate, distinguish our actual holding in Griffin? Well, I think that in Griffin it's — it's quite distinguishable because the inmate in Griffin, well, first of all, was — was in State, you know, prison instead of in Federal prison, so the requirements were apparently different. But when — what he didn't say was that it was medical needs that were his problem and that the prison officials weren't responding to them. I mean, he just sort of kept asking for a higher bunk, and he said that he — he asked for a ladder or a permanent step. He didn't ask for treatment or — he didn't even say something rhetorical like, how can you do this to me? I'm sick. Can't you see I can't get up there? There was a problem, but wouldn't they have had the nurse's recommendation in the file there also? You know, we're talking about looking at the complete file. So they had all that information, but we said that wasn't enough to exhaust his remedy on the — on his bunk claim. Well, they had the nurse's information, but, I mean, he didn't state that that was his problem, whereas I think that Mr. Nunez is stating that the search is his problem when he, you know, states what's the authority for it and when he suggests that it's unconstitutional and he says that the officers have abused the color of law. So I do think it's distinguishable on those facts. The next point that I would want to bring out is simply that not only is there no evidence that the prison engaged in routine searches on return from this kind of work and, therefore, had been defining it as an outside work detail all along in response to Judge Fletcher's questions, there's affirmative evidence that they weren't doing it before. And that affirmative evidence is in the affidavit of Salvador Buenrostro that the government credited on other points. You know, that affirmative evidence is that Mr. Buenrostro asks Officer Duncan, why are you doing this now? This is a good job. You know, I don't want to have to leave it because you're starting this anew. There's also affirmative evidence that the search wasn't done pursuant to that program in that Salvador Buenrostro states that Officer Duncan makes a party statement, a statement of his own intention to search Nunez. You know, I don't care who he is and I'm going to search him the next time he comes to work. And this is a statement of suggesting that the raffle and choosing inmates at random had nothing to do with it, that it wasn't just a one-in-four chance that Mr. Nunez would be searched. And finally, I would say in response to Judge Aicuda's concerns about pretext and how we don't go to the subjective intention of the officer or the governmental actor conducting the search, it's true that, you know, there are plenty of cases where this Court and the Supreme Court have held that, you know, a pretext for a search is okay as long as there is some authority to justify it. But I think there's a difference between a pretext such as you didn't use a turn signal and I really think you've got drugs, so I want to stop you and get a look in the trunk of the car, than there is when your pretext is an affirmatively bad reason, such as, you know, I want to search you because I know that you're, you know, you like to file legal papers, you like to speak up about your rights. Or worse, you know, what if somebody said I wanted to search you because of, you know, your race or your religion? Certainly, we would think that there are affirmative reasons and intentions for search that are wrong. Kagan. I am the O'Connor Supreme Court case saying the Fourth Amendment inquiry is one of subjective reasonableness, and subjective concepts like malice and sadism have no proper place in that inquiry. So I think I'm concerned that it doesn't really line up with what the Supreme Court has said about Fourth Amendment and how we analyze that even in the prisoner context. Well, I would submit again that it isn't so much about the officer's feelings or whether they're, you know, they did it to be mean or something like that, but whether there is some affirmative, affirmatively bad reason. I think the Supreme Court hasn't addressed that, where someone has raised a material issue of fact that there is some affirmative reason about the person's identity or exercise of their rights that has caused the officer to want to retaliate against them. In Bell v. Wolfish, the Supreme Court talked in part about the justification for initiating the search as one of the sort of elements you weigh. Does that open the door in the prison context to some of this subjective questioning here? I think that it opens the door only in the sense, the same way that the Michigan v. Bell case opens the door to suggest that people have to – prison officials can have rules and policies and follow them, but they need to be applied fairly and systematically and not arbitrarily, capriciously, or for pernicious reasons like retaliation. I think that a key case, for example, to look at in this circuit, applying the Bell case, is the Mitchenfelder v. Sumner case. That is an older case, but it's striking because in that case, the search that was conducted was not routinely conducted. And the court was dealing with every single inmate at the transition, and they were dealing with the 40 most dangerous inmates in the state. In that case, this court emphasized that the situation could easily be different with inmates who are not so dangerous or where the search was not routinely conducted and finding comprehend. Thank you very much. Thank you, both sides. Very interesting case and good arguments on both sides. Before I let you go, though, I'd like to say one thing, which I customarily say. The Perkins firm took this case on pro bono, and we are grateful to the firms that do this. And when I say this, it has nothing to do with the merits of this case. I just want to say thank you very much to the Perkins firm, to Ms. Farmachandran and Mr. Gidley. And the case is now submitted, Munoz v. Nothing. Thank you. Thank you. The next case on the argument calendar is Smith v. Guide One Mutual Insurance.
judges: W. Fletcher, Ikuta, Seabright